MERCHANTS NATIONAL BANK OF GRAND FORKS v. JAMES E.
SULLIVAN.[1]

January 21, 1896.

Nos. 9773—(301).

**Promissory Note—Bona Fide Purchaser—Illegal Consideration.**

Plaintiff bank is indorsee before maturity of the negotiable promissory notes in suit. *Held*, conceding that they were received by it in the due course of business for a valuable consideration, still, on the evidence, the trial court was justified in finding that plaintiff had notice that they were given for a gambling debt; that its failure to inquire as to the consideration of the notes amounted to bad faith; and that it was not an innocent purchaser.

**Judgment Sustained.**

*Held*, the evidence sustains the judgment.

Appeal by plaintiff from a judgment of the district court for Polk county, in favor of defendant, entered in pursuance of the findings and order of Ives, J. Affirmed.

*A. A. Miller* and *F. H. McDermont*, for appellant.

*R. J. Montague* and *Cochrane & Feetham*, for respondent.

CANTY, J. This is an action on two promissory notes made by defendant to the order of Doheny & Lyons, and indorsed to plaintiff before maturity. The defense is that the notes were given for money lost by defendant in gambling in wheat options in the "bucket shop" run by the payees; that there was no other consideration for the notes; and that all of these facts were well known to plaintiff when it purchased the notes. On the trial before the court, without a jury, the court found for the defendant on this defense, and, from the judgment entered thereon, plaintiff appeals.

It appears indisputably from the evidence that the only consideration for the notes in question was the purchase of options, and the losses of the defendant while gambling in options in the bucket shop of which W. J. Doheny was the manager, and that he was the owner of the business, or else it was owned by a firm composed of the wife of Doheny and one Lyons, or by all of them. It also ap-

pears that one Wybrant was for a time connected with the business, either as assistant manager, capper, or part owner, or in all of these capacities. The notes were indorsed to the bank before maturity, as collateral security for a note of W. J. Doheny held by it.

Notwithstanding the various assignments of error, the only point urged by appellant is that the bank was an innocent purchaser of the notes.

The bucket shop in question was carried on at Grand Forks, North Dakota. The plaintiff carried on a banking business in the same city. Doheny and Wybrant both resided there, and defendant, apparently a farmer, who raised wheat himself, resided about a mile and a quarter from Grand Forks, on the Minnesota side of the river. The two notes in question were dated June 30, 1893, payable to the order of Doheny & Lyons; were due in 90 days from date; and were for $500 each. The cashier of the bank testified that M. J. Doheny had been owing the bank for some time, and that some time in July of that year he came to the bank, Wybrant accompanying him, and indorsed each of the notes, "Pay to H. P. Wybrant or order. Doheny & Lyons." Then Wybrant indorsed the notes in blank, and they were delivered to the cashier as such collateral security for Doheny's individual note as then renewed. On cross-examination the cashier further testified: "I knew at that time that W. J. Doheny was in the grain commission business. I do not know what you call it, but presume it was called a 'bucket shop.' The business was called the 'Grand Forks Commission Company.' I presume that it was generally known around town that both Doheny and Wybrant were operating in wheat options. It was not known to me of my own personal knowledge. I presume that was their general reputation." Other testimony offered by defendant shows that the bucket shop was not then run in the name of the Grand Forks Commission Company, but in the name of Doheny & Lyons; that this was generally and notoriously known in Grand Forks; and that it was also generally and notoriously known that Wybrant had no business or visible means of support at this time, except such as he derived from his connection with this bucket shop.

It also appears from the evidence that, on June 15 of the same year, defendant made three other notes, aggregating $800, due in

60 and 90 days, to Doheny & Lyons, for other losses incurred by him in gambling in this bucket shop, and that these notes were indorsed to the bank on July 3 of that year, in the same manner as the notes here in suit. Defendant, on his own behalf, testified that in December, 1892, or January, 1893, he went to the plaintiff bank to borrow $200, to deal in options. Said the witness: "I went in to Mr. McLauren [the cashier], and asked for $200, and told him what I wanted it for, and told him the business I was in, and said I was holding my wheat, and it went down a few cents, and I was going to buy 5,000 bushels of option wheat to make up the loss, so I could get even. And Mr. McLauren made some remark that it was better never to touch it, and said a man was a fool to deal in options. I remember his words well. I got the money, and the notes were drawn, I think, payable on demand." The defendant further testified that afterwards, on June 28, 1893, he went to the plaintiff bank, and attempted to get an extension of time on this and some other indebtedness which he owed the bank, and that the cashier, McLauren, questioned him as to his financial standing, and as to what he owed. Said the witness: "I told him what I owed the Second National Bank. And he said, 'Does Doheny & Lyons hold any of your paper?' And I said, 'They hold some gambling paper,' and he remarked that I had already given the other notes." These conversations are denied by McLauren, but the question of veracity between the witnesses was for the trial court.

Then, taking the testimony most favorable to defendant, the bank knew, when the notes in suit were offered to it, that the regular business of the payee of the notes was that of running a gambling establishment; that the indorser Wybrant was also a gambler, connected with this gambling establishment, and had no other business; that the defendant had been gambling in options at this same establishment, and, in settlement of his losses, had already given notes to the amount of $800 to the same payee, which were indorsed by the same parties, in exactly the same form, and were offered to the plaintiff bank in the same manner, as the notes in suit were offered. Furthermore, the plaintiff accepted those first notes, and claimed to be an innocent purchaser of them, just as it does of the notes here in suit, although, if the testimony of defendant is to be believed, it knew, when it accepted these first notes,

that they were given in settlement of his gambling transactions. It is true that Doheny & Lyons also ran a grocery store. But there was no possible reason for supposing that the defendant, presumably running an ordinary farm, would have any use for $1,800 worth of groceries in so short a time, or that he had allowed his bill for groceries to run until it amounted to that sum. Neither was there any probability that Wybrant, who had no other business but his connection with the bucket shop, would indorse all of these notes if they were given for groceries, or for anything else than the purchasing of options in this bucket shop.

Conceding that plaintiff took the notes in suit in the usual course of business, and is entitled to be protected as an innocent purchaser, unless it had knowledge or notice of such facts that its failure to make inquiry amounted to bad faith, still we are of the opinion that the evidence was, if believed by the trial court, sufficient to convict it of bad faith, and therefore the judgment should be affirmed. It was not a case where the payee or party procuring the note from the maker indulged in gambling occasionally, but it was his regular business, and all the facts brought home to the bank conspired to make it highly probable that the notes were given to purchase options, or in settlement of losses incurred in gambling in options.

Judgment affirmed.